# United States Court of Appeals
## For the First Circuit

No. 16-1403

LUCIA SALVATI, INDIVIDUALLY, AND AS THE ASSIGNEE OF ROBERT
EASTON, AJAX INVESTMENT PARTNERS, LLC, LOVEJOY WHARF, LLC,
BEVERLY WHARF, LLC, NORTH WASHINGTON WHARF, LLC, AND AB WHARF,
LLC,

Plaintiff, Appellant,

v.

AMERICAN INSURANCE COMPANY,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Barron, Stahl, and Lipez,
Circuit Judges.

---

Donald R. Grady, Jr., with whom Frank J. Federico, Jr., Susan
E. Bochnak, and Sheff Law Offices, P.C. were on brief, for
appellant.
Gregory P. Varga, with whom Linda L. Morkan, Jonathan E.
Small, and Robinson & Cole LLP were on brief, for appellee.

---

April 26, 2017

**LIPEZ**, **Circuit Judge**.  In this insurance dispute, we must decide whether the plaintiff in a wrongful death action, who reached a settlement with the defendants and their primary insurance carrier, can recover the amount exceeding the primary policy limits from the defendants' excess insurer.  The district court concluded that the settlement agreement did not trigger the excess policy because the agreement was not accompanied by a court judgment.  Hence, it granted the excess insurer's motion to dismiss the plaintiff's claims under the policy.  While we disagree with the district court's interpretation of the pertinent policy language, we affirm the dismissal because the plaintiff has not presented a plausible argument that the settlement agreement triggered the excess insurer's duty to indemnify.

**I.**

**A. The Accident**

On June 17, 2010, Gerardo Salvati died as a result of injuries he sustained while doing maintenance work for Ajax Management Partners, LLC at the Lovejoy Wharf building in Boston. On that day, Mr. Salvati was asked to examine the condition of the brick facade of the building.  While he was standing on a ladder inspecting the building, a sizable chunk of brickwork came loose and suddenly fell from the building, crashing into him and causing him to fall to his death.  According to the operative complaint

before the district court, the building had been in a state of disrepair for years, and the owners of the property were aware that the building's loose and decaying brickwork was in need of repair.

In September 2011, Gerardo Salvati's wife, Lucia (hereinafter referred to as "Salvati"), filed a lawsuit in Suffolk County Superior Court, seeking damages for wrongful death and loss of consortium individually and in her capacity as executrix of her husband's estate. The defendants in that action (the "Underlying Defendants") were Robert Easton, Gerardo Salvati's supervisor at the time of his death and the person holding the ladder when the accident occurred, and a group of individuals and limited liability companies who owned the building where the accident occurred.[1] The Underlying Defendants had two insurance policies: a primary policy through Western World Insurance Company ("Western World") in the amount of $1 million and an excess policy through the American Insurance Company ("AIC") in the amount of $9 million (the "Excess Policy"). The Underlying Defendants informed both insurance companies of Salvati's claims.

---

[1] The other defendants were Ajax Investment Partners, LLC, Lovejoy Wharf, LLC, Beverly Wharf, LLC, North Washington Wharf, LLC, and AB Wharf, LLC. Because Ajax Management had workers' compensation coverage, it was not a defendant in either the state court wrongful death action or the instant litigation.

In October 2012, AIC informed the Underlying Defendants that it would not defend them against, or indemnify them for damages from, Salvati's suit.[2] AIC's disavowal of coverage effectively left the Underlying Defendants with only the primary policy from Western World. The Underlying Defendants thus initially told Salvati that they were insured for only $1 million, although Salvati later learned of the Excess Policy. The parties attempted mediation, during which Salvati requested damages in excess of the primary insurance coverage, but within the coverage amount of the Excess Policy. Despite AIC's refusal to defend the Underlying Defendants, a representative and an attorney from AIC were present at the mediation sessions. The parties failed to reach an accord during mediation. In November 2014, Salvati sent a demand letter to AIC seeking payment under the Excess Policy, but AIC once again refused to provide coverage.

**B. The Settlement Agreement**

Salvati and the Underlying Defendants finally reached a $6 million settlement agreement (the "Settlement Agreement") in December 2014. The Settlement Agreement has three key elements relevant to this appeal. First, as the district court observed,

---

[2] AIC explained that it was denying coverage because, inter alia, the policy did not apply to liability stemming from an injury to an employee of the insured party during the course of his employment.

it "provided for the total payment of $6,000,000 to Salvati." Salvati v. Am. Ins. Co., No. 1:15-cv-13136-RWZ, slip op. at 2 (D. Mass. Mar. 15, 2016) (Memorandum of Decision and Order). Second, in exchange for tendering the full $1 million of the Western World primary insurance policy, the Agreement released both Western World and the Underlying Defendants from any further liability. Third, the Agreement assigned all rights previously held by the Underlying Defendants against AIC to Salvati, allowing her to seek recovery of the remaining $5 million from the Excess Policy. However, the Agreement also stipulated that the settlement was not contingent on the ultimate availability of the excess coverage, and specified that the Underlying Defendants did not represent that excess coverage was necessarily available. Moreover, the Underlying Defendants expressly disclaimed wrongdoing in the Agreement.

Pursuant to Massachusetts law, which requires court approval of settlements of cases in which workers' compensation benefits have been paid, see Mass. Gen. Laws ch. 152, § 15, the Superior Court approved the Settlement Agreement, and the case was dismissed with prejudice.

**C. The Present Case**

In April 2015 Salvati, acting as the assignee of the Underlying Defendants, filed a two-count complaint against AIC in

- 5 -

Suffolk County Superior Court. In Count I, she alleged that AIC had breached its contract (i.e. the Excess Policy agreement) with the Underlying Defendants by refusing to indemnify them for the liability they had incurred through the Settlement Agreement. In Count II, she sought a declaratory judgment that she was entitled to collect the remainder of the settlement amount from AIC under the Excess Policy.

AIC removed the case to federal court and filed a motion to dismiss, which the district court denied. Meanwhile, Salvati filed an amended complaint in which she added claims under Massachusetts General Laws chapter 93A (Count III, consumer protection) and chapter 176D (Count IV, unfair and deceptive acts in insurance), as well as two counts of professional negligence based on AIC's failure to settle her claims against the insureds (Counts V and VI). AIC responded with a second motion to dismiss.

The district court granted this motion, holding that the amended complaint failed to state a cognizable claim for breach of contract (Count I) and declaratory judgment (Count II). The court reasoned that AIC's duty to indemnify could only be triggered when the Underlying Defendants became legally obligated to pay Salvati. Here, however, the Underlying Defendants had not incurred such an obligation "because the Underlying Action was dismissed with prejudice and no judgment entered against the Underlying

- 6 -

Defendants, AIC's insured." Moreover, the court noted that "AIC was not a party to the underlying settlement and thus never agreed or became contractually bound to pay the $5,000,000." Salvati, No. 1:15-cv-13136-RWZ, slip op. at 5.

The court also concluded that, because AIC's obligation to pay under the terms of the Excess Policy was a necessary condition to the Chapter 93A consumer protection claim (Count IV) and the professional negligence claims (Counts V and VI), it was appropriate to dismiss those claims. Finally, the court dismissed Count III, which alleged a violation of Massachusetts General Laws chapter 176D for failure to settle an insurance claim in which liability has become reasonably clear, on the ground that Chapter 176D "provides no private cause of action and is enforceable only by the commissioner of insurance." Id. at 6 (quoting Metro. Prop. & Cas. Ins. Co. v. Bos. Reg'l Physical Therapy, Inc., 538 F. Supp. 2d 338, 343 (D. Mass. 2008)). On appeal, Salvati argues that the district court erred in dismissing each of her claims.

## II.

We review a district court's dismissal for failure to state a claim de novo. Coll. Hill Props., LLC v. City of Worcester, 821 F.3d 193, 195 (1st Cir. 2016). As this case comes to us through diversity jurisdiction, we look to state law to determine the substantive rules of decision. See Erie R.R. Co. v. Tompkins,

- 7 -

304 U.S. 64, 78 (1938).  It is undisputed that Massachusetts law applies in this case.  The insured risk was located in Massachusetts, and the underlying accident occurred in Massachusetts.  See Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 669 (Mass. 1985).

## A. Count One: Breach of Contract

We begin with the breach of contract claim because the determination of AIC's contractual obligation will in turn affect our review of most of the remaining claims.  We review de novo the district court's interpretation of the excess insurance contract. See Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012).

The scope of coverage is determined by the policy language, Sanders v. Phoenix Ins. Co., 843 F.3d 37, 45 (1st Cir. 2016), and, in construing the policy, we "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered," Hazen Paper Co. v. U.S. Fid. & Guar. Co., 555 N.E.2d 576, 583 (Mass. 1990).  Any ambiguities in the policy's terms are resolved against the insurer. Vickodil v. Lexington Ins. Co., 587 N.E.2d 777, 778 (Mass. 1992). The insured, however, "generally bears the burden of proving that a particular claim falls within a policy's coverage."  Allmerica

Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007).

## 1. The Scope of AIC's Excess Policy

The language at the heart of this dispute appears in the primary indemnification provision of the Excess Policy, where AIC agrees to "pay on behalf of any Insured those sums in excess of the Primary Insurance that any Insured becomes legally obligated to pay as damages."[3] Salvati argues that AIC's duty to indemnify the Underlying Defendants was triggered when the Underlying Defendants signed the Settlement Agreement, which "effectuate[d] a full and complete settlement . . . in the amount of $6,000,000." By failing to indemnify the Underlying Defendants (or her, as their assignee), she thus claims, AIC breached its contract.

AIC responds that its duty to indemnify was not triggered by the Settlement Agreement because only a judgment can "legally obligate[]" a party to pay "damages." The district court agreed, holding that "there was never any legal determination of liability" because "no judgment entered against the Underlying Defendants," and thus AIC has no duty to indemnify the Underlying Defendants (or Salvati) for the $5 million of the Settlement Agreement in excess of Western World's payment.

---

[3] Such damages also must be covered by primary insurance and arise from an event occurring during the policy period.

Our own review of the indemnification language, in the context of the policy as a whole, leads us to a different conclusion. See Gen. Convention of New Jerusalem in U.S., Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007) ("The words of a contract must be considered in the context of the entire contract rather than in isolation."). As we shall explain, multiple policy provisions reveal that the requisite "legal obligat[ion]" to pay "damages" can arise from either a court judgment or a settlement agreement that is wholly contractual in nature.

As a general matter -- and contrary to AIC's assertion -- the term "damages" does not itself signify the need for a court judgment. Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, Black's Law Dictionary (10th ed. 2014). This definition does not require that a court, or any other formal body, order the payment of such compensation. Nor does the Excess Policy set forth a more limited meaning of "damages"; the term is not defined in the policy. Hence, we must look to other provisions of the policy to determine whether "damages" resulting from a settlement are within the scope of AIC's duty to indemnify.

We find one clue in the Excess Policy's definition of the term "Suit" as "a civil proceeding in which damages insured by this policy are alleged." This definition goes on to specify, in

- 10 -

pertinent part, that such civil proceedings include arbitrations and "[a]ny other alternative dispute resolution proceeding[s] in which such damages are claimed." Obligations to pay arising out of an arbitration or alternative dispute resolution proceeding are not judgments, but rather contractual obligations. It is "a general rule in the construction of a written instrument that the same word occurring more than once is to be given the same meaning unless a different meaning is demanded by the context." Barilaro v. Consol. Rail Corp., 876 F.2d 260, 265 n.10 (1st Cir. 1989) (quoting Dana v. Wildey Sav. Bank, 2 N.E.2d 450, 453 (Mass. 1936)). The policy's recognition that "damages" may be claimed in non-judicial proceedings, therefore, contradicts AIC's position that the term "damages" in the indemnification provision covers only obligations to pay arising out of a judgment.

Moreover, the way in which the word "settlement" is used in the Excess Policy reinforces the view that AIC's duty to indemnify may be triggered by a settlement, including one that is not memorialized in a judgment. The policy provides that, if the limits of a primary insurance policy are reduced or exhausted "by payments of judgments or settlements arising out of Occurrences, our policy will apply in excess of such reduced or exhausted limit of insurance." Similarly, AIC's duty to defend is triggered "[a]fter the applicable limits of insurance of Primary Insurance

- 11 -

and Other Insurance cease to apply because of exhaustion by the payment of judgments or settlements." Through the use of the word "or," these provisions depict "judgments" and "settlements" as alternatives; "settlements" are not presented as simply a subset of "judgments."

This understanding of the term "settlement" informs our interpretation of another provision of the Excess Policy, the condition that "settlement [by the insured] requires our prior written authorization."[4] Such a requirement of prior approval makes sense only if settlements could trigger AIC's duty to indemnify. In light of the provision discussed above that frames settlements and judgments as alternatives, settlements that are not memorialized in a judgment must be included within the scope of this requirement.

Finally, the Excess Policy also requires the insured to "[c]ooperate with [AIC] in the investigation or settlement of any claim, or the defense of any insured against any Suit." Again, the presentation of two alternatives -- a "claim" and a "Suit" -- is significant. The policy appears to recognize that the "settlement of [a] claim" may occur before a civil proceeding

---

[4] According to the policy, this condition applies only in jurisdictions where AIC cannot defend the insured against a suit.

- 12 -

(a "Suit") has commenced.[5]  Any such settlement would not be accompanied by the entry of a judgment.

In sum, a close review of the terms of the Excess Policy indicates that AIC's obligation to indemnify may be triggered by the settlement of a claim that is not accompanied by a judgment.[6] Hence, a settlement agreement that imposes upon the insured a "legal[] obligat[ion] to pay" an amount in excess of the primary insurance may meet the terms of the indemnification provision.

## 2. The Applicability of the Excess Policy to the Settlement Agreement

AIC contends that, even if the Underlying Defendants could have become "legally obligated to pay . . . damages" through a settlement, the agreement at issue here did not trigger AIC's duty to indemnify because it did not legally obligate the Underlying Defendants to pay anything beyond the $1 million

---

[5] A similar distinction is made in another provision of the policy, which gives AIC discretion to "a. [i]nvestigate any Occurrence, claim or Suit; or b. [s]ettle any claim or Suit."

[6] We dismiss out of hand AIC's contention that our precedent dictates that the Excess Policy's language can be satisfied only by a judgment.  AIC cites <u>Great American Insurance Co.</u> v. <u>Riso, Inc.</u> for the proposition that "the duty to indemnify is triggered only 'when a judgment within the policy coverage is rendered against [the] insured.'"  479 F.3d 158, 160 (1st Cir. 2007) (emphasis omitted) (quoting <u>Bos. Symphony Orchestra, Inc.</u> v. <u>Commercial Union Ins. Co.</u>, 545 N.E.2d 1156, 1158 (Mass. 1989)). Neither <u>Great American Insurance Co.</u> nor the Massachusetts case it quotes addresses whether a settlement could satisfy the "legally obligated to pay as damages" language.

available through Western World's primary policy.  Although the Settlement Agreement purported to create a "settlement . . . in the amount of $6,000,0000," the only payment it required was a check from Western World for $1 million.  The remaining value was attributed to the assignment to Salvati "of all rights [the Underlying Defendants] may have . . . with regard to the Excess Liability Policy . . . issued by [AIC]."  Moreover, AIC points out that the Settlement Agreement released the Underlying Defendants from liability, and the parties agreed to dismissal of the suit, precluding liability on the part of the Underlying Defendants. Because the settlement did not obligate the Underlying Defendants to pay a "sum in excess of the Primary Insurance," AIC contends, the Agreement did not trigger AIC's indemnification liability. Therefore, AIC did not breach its contract with the Underlying Defendants by refusing to indemnify them.

This reading reflects the plain language of the Settlement Agreement.  Salvati does not respond to this argument in her briefs or, indeed, offer any theory to support a conclusion that the Settlement Agreement imposes on the Underlying Defendants a "legal[] obligat[ion] to pay" sufficient to trigger the Excess Policy's indemnification provision.  Instead, Salvati simply asserts that, because the primary policy was exhausted and $5 million of the $6 million settlement amount remains unpaid, AIC

must pay that remaining amount.  See Appellant's Brief ("App. Br.") at 26 ("AIC should then have tendered the excess amount of $5,000,000.00 to the insured, who would have paid that amount to the Plaintiff.").

Similarly, without explaining how they support a "legal[] obligat[ion]," Salvati also sets out a series of principles and facts concerning the obligations of excess insurers generally and of AIC in this case.  She acknowledges that "[t]he primary insurer must exhaust the full limits of its coverage before an excess insurer can be required to contribute to a compromise settlement or judgment."  App. Br. at 15; see 15 Couch on Ins. § 220:32 (3d ed. 2016) ("[I]t is only after the underlying primary policy has been exhausted does [sic] the excess or umbrella coverage kick in.").  And she correctly points out that "Western World exhausted its policy limits [through] the settlement."  App. Br. at 26; see 15 Couch on Ins. § 220:32 ("[P]rimary coverage is 'exhausted' when the primary insurers pay their policy limits in settlement or to satisfy a judgment against the insured.").

She also argues that the scope of AIC's duty to indemnify must be determined by the basis for the settlement, that is, "'whether any portion of the settlement was made in compensation for' the [Underlying Defendants'] acts, and if so, whether the acts fell under [the excess] insurer's coverage."  App. Br. at 16

- 15 -

(quoting Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 66 (1st Cir. 2000)). She asserts that "the entire settlement was made in compensation for the acts of the Underlying Defendants," and that those acts were covered by AIC's Excess Policy. App. Br. at 18. She further claims that "the Settlement Agreement was made in good faith and in reasonable anticipation of liability." App. Br. at 20; see, e.g., Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co., 480 F.3d 1254, 1261 (11th Cir. 2007) (noting that an insurer is only bound by a settlement agreement "so long as the settlement is covered, reasonable, and made in good faith").

But even if the Settlement Agreement meets all of these prerequisites, this compliance does not demonstrate how the Settlement Agreement "legally obligated" the Underlying Defendants to pay her the $5 million she seeks to recover from AIC. Nor does Salvati argue that, in light of other policy language, the text of the indemnification provision requires less than AIC suggests. She does not contend that AIC somehow waived the right to rely on that language, perhaps through its continued refusal to defend or indemnify the Underlying Defendants.[7] And she does not assert that

---

[7] Other jurisdictions, for example, have found that by breaching its duty to defend the insured, an insurer waives the right to rely on similar policy language. See, e.g., Twin City Fire Ins. Co., 480 F.3d at 1261; Jones v. S. Marine & Aviation Underwriters, Inc., 888 F.2d 358, 361 (5th Cir. 1989).

- 16 -

we should refuse to enforce the provision on policy grounds, or that Massachusetts law does not require the strict enforcement of such language.

We do not mean to suggest that such arguments necessarily would have succeeded.  But Salvati's failure to explain how the Settlement Agreement triggered the Excess Policy's indemnification provision leaves us without a rationale for finding that AIC's refusal to indemnify constituted a breach of contract.  We thus affirm, on this different ground, the district court's decision to dismiss Count I.

We note, however, that this outcome was not inevitable. A settlement structured differently could have met the requirements of the Excess Policy by creating a "legal[] obligat[ion]" on the part of the Underlying Defendants.  In fact, it was possible to structure such a settlement while also achieving the parties' apparent goal of shielding the Underlying Defendants from direct exposure to liability.

The Massachusetts Supreme Judicial Court has held that in cases where an insurer such as AIC declined to settle a claim for an amount within its policy limits, a settlement agreement between the plaintiff and the insured that has been reduced to a judgment may create a legal obligation that would satisfy an insurance policy's requirements, even when the settlement is

accompanied by a separate agreement releasing the insured from liability.  See Campione v. Wilson, 661 N.E.2d 658, 661-62 (Mass. 1996); see also Gray v. Grain Dealers Mut. Ins. Co., 871 F.2d 1128, 1131-33 (D.C. Cir. 1989) (release of insured from liability after default judgment did not nullify the basis for assignment of insured's cause of action against insurer).  In Campione, the parties entered into a settlement agreement and an agreement for judgment contemporaneously with an assignment of claims and a conditional release of the defendants (contingent on their cooperation with the plaintiffs' future lawsuit).[8]  661 N.E.2d at 660.  Salvati could have pursued a similar arrangement here.[9]

The difference between this approach and the Settlement Agreement may seem technical, but it is significant.  In Campione, the judgment entered by the court pursuant to the parties'

---

[8] Cognizant of the risk of collusion between the plaintiff and the insured present in such arrangements, the Campione court explained that "the risk of collusion in this case appears minimal in view of the seriousness of the accident, the existence of liability, and the probability that a fact finder will find that damages exceeded any existing insurance coverage."  661 N.E.2d at 663.

[9] Although this arrangement involves a judgment, we note that there is no inconsistency between our comments here and our holding in the previous section that a judgment is not required to satisfy the policy language.  There could be a settlement agreement, unlike the agreement here, that by its terms meets the "legally obligated to pay" requirement of the excess policy language, even in the absence of a judgment.  However, we take no position as to whether the logic of Campione would apply to a settlement without a judgment; Campione does not expressly resolve that issue.

agreement imposed upon the insured a legal obligation to pay the plaintiff. The court concluded that "the legal basis for the claim against the insurer" did not "disappear[] when the insured became insulated from liability due to a release or a covenant not to execute." 661 N.E.2d at 662. One commentator has explained the rationale as follows:

> [i]f the plaintiff were to renege on its promise and attempt to collect the judgment from the insured rather than from the insurer, the insured would have a breach of contract claim against the plaintiff, but the plaintiff's promise [would] not [have] extinguish[ed] either the insured's responsibility for the plaintiff's damages or the underlying tort liability.

Douglas R. Richmond, The Consent Judgment Quandary of Insurance Law, 48 Tort Trial & Ins. Prac. L.J. 537, 556 (2013). But see 13-67 Corbin on Contracts § 67.14 (2016) (explaining that, where a plaintiff breaches its promise and attempts to collect from the released party, courts will generally consider the release to be a discharge of liability). In the case at hand, by contrast, the Underlying Defendants never incurred any "legal[] obligat[ion]," either through a contract or a judgment, to pay Salvati. The indemnification provision was not, therefore, triggered, and AIC's refusal to indemnify the Underlying Defendants was not a breach of contract.

We recognize that AIC's denial of coverage has left Salvati in a difficult position, and that our adherence to the

terms of the Excess Policy may seem unforgiving.  We cannot, however, rewrite the Settlement Agreement so that it triggers the Excess Policy.  Nor can we rewrite the language of the Excess Policy to cover the Settlement Agreement.  Consequently, we must affirm the district court's dismissal of Count I.

**B. Remaining Counts**

The district court dismissed four of Salvati's five remaining counts after concluding that AIC's obligation to pay under the Excess Policy was a necessary precondition of those counts.  As explained above, while we disagree with the district court's reasoning, we similarly find that Salvati has failed to demonstrate that AIC is obligated to pay her under the Excess Policy.  Accordingly, we affirm the district court's dismissal of Count II (declaratory judgment), Count IV (violation of Mass. Gen. Laws ch. 93A), and Counts V and VI (professional negligence).

The district court dismissed Salvati's final claim, Count III, based on a different rationale, with which we agree.  Massachusetts General Laws chapter 176D, which prohibits unfair and deceptive insurance practices, "provides no private cause of action and is enforceable only by the commissioner of insurance." Thorpe v. Mut. of Omaha Ins. Co., 984 F.2d 541, 544 n.1 (1st Cir. 1993).  When bringing a claim under Chapter 93A, which encompasses unfair and deceptive insurance practices, a plaintiff may argue

that an insurer acted in violation of Chapter 176D.  However, "to the extent that [the count] attempts to state an independent claim for recovery under [C]hapter 176D, it must fail."  M. DeMatteo Const. Co. v. Century Indem. Co., 182 F. Supp. 2d 146, 160 (D. Mass. 2001).  We therefore affirm the district court's dismissal of Count III.

## III.

Because appellant has failed to show that the Settlement Agreement triggered AIC's duty to indemnify, and because she may not bring a claim under Chapter 176D, none of her causes of action survive.  Accordingly, we affirm the district court's grant of AIC's motion to dismiss the complaint.

**So ordered.**

**-Concurring Opinion Follows-**

**STAHL**, **Circuit Judge, concurring.** While I join this opinion, I write separately to express my concerns about its potential ramifications. It goes without saying that the typical consumer who purchases excess insurance expects that such insurance will protect him or her in the event of a catastrophic accident where liability is relatively certain and where a potential judgment will likely exceed the primary coverage. Here, the Underlying Defendants, recognizing the extent of Salvati's claim, reasonably believed that their primary and excess insurance policies would protect them. Likewise, Salvati, having gained knowledge of the Defendants' primary and excess coverage, knowledge in part gained through the excess carrier's presence during the settlement discussions, reasonably believed that the excess policy would cover the amount of the settlement that exceeded the primary policy limit. Notwithstanding that reasonable expectation, we now hold that the documents presented to us on appeal, interpreted with the aid of fragmentary guidance from Massachusetts courts, require us to find that this particular settlement agreement did not trigger an obligation to indemnify under the excess insurance policy. While the opinion's parsing of the relevant contractual terms is admirable, the end result lays bare several troubling practical consequences that may ultimately decrease the incentives for plaintiffs, defendants, and insurers

- 22 -

to settle, which in turn may lead to more trials, higher costs, and less effective excess insurance coverage.[10]

My concerns stem from a hypothetical. Think about a case like this one, only where the settlement discussions occur after this opinion's release. Given our strict interpretation of the terms of the Settlement Agreement and the Underlying Defendants' excess insurance policy, it seems somewhat unrealistic to expect future plaintiffs to settle their claims unless the defendants either assume liability or the primary carrier throws in its entire policy and the litigation continues towards a trial, which should obviously implicate the excess carrier. Of course, it seems that this problem would not occur if the excess carrier was the same carrier as the primary carrier. However, this is likely not the case for many insureds. See Scott M. Seaman & Charlene Kittredge, Excess Liability Insurance: Law and Litigation, 32 Tort & Ins. L.J. 653, 653-54 (1997) (observing that "the importance of excess insurance and the role of excess insurers as active participants in coverage litigation ha[s] grown

---

[10] See Campione v. Wilson, 661 N.E.2d 658, 663 (Mass. 1996) (noting the importance of "giv[ing] effect to" heavily-negotiated insurance settlements, especially where "the plaintiffs have voluntarily assumed the burden of proving any claims that [an underlying defendant] may have against [an excess insurer]," the underlying defendant's "liability for the accident is reasonably clear, the primary insurer has paid the full limits of its policy, and damages are substantial").

- 23 -

exponentially" due to a variety of factors, including the increased issuance of "excess insurance contracts as commercial and professional insureds purchase excess coverage as part of comprehensive risk management programs," the "increased exposures of the insureds" due to substantive legal changes, and the "high monetary stakes" accompanying coverage disputes).

Likewise, it appears equally unrealistic to expect insured defendants to <u>agree</u> to assume liability with no assurance that their excess policy would cover the portion of liability that exceeds their primary coverage. After all, defendants rely on their excess insurance policies, and eschew assumptions of liability, because these policies "are risk-spreading devices. They exist primarily because the stakes of liability to an insured are greater than they are to the insurer, which can spread the loss across all of its customers." <u>Trs. of the Univ. of Pa. v. Lexington Ins. Co.</u>, 815 F.2d 890, 901 (3d Cir. 1987). However, the risk that an excess insurer might, as has occurred here, refuse to cover means that an underlying defendant, facing the potential of millions of dollars in liability and having purchased insurance precisely to avoid the type of potential liability in question, will push for a result that is similar to what occurred here: a settlement that includes a release of liability or a covenant not

to execute, and an assignment of rights to sue on the excess policy to the plaintiff.[11]

Simply put, I am concerned that parties will be less likely to agree to settlements in disputes where the primary coverage is clearly inadequate. This outcome "run[s] counter to the well-accepted public policy favoring settlement of insurance disputes" and could create other "perverse incentives" for insurers, such as "encouraging [them] to disclaim their duties to defend" and, subsequent to this, their duty to indemnify. IMG Worldwide, Inc. v. Westchester Fire Ins. Co., 572 F. App'x 402, 411-12 (6th Cir. 2014); see also 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes, § 6.03[b] (16th Ed. 2013) (noting that "the insured, having purchased both primary and excess coverage, cannot be abandoned by its insurers" (citing Hocker v. N.H. Ins. Co., 922 F.2d 1476 (10th Cir. 1991))).

To that end, many courts impose a duty to defend on excess carriers when the potential scope of liability plainly

---

[11] These types of settlements are not only attractive cost-saving options for litigants, but frequently necessary ones in cases where, like this one, an insurance carrier abandons its insured or its insured's assignee. See, e.g., Foremost Cty. Mut. Ins. Co. v. Home Indem. Co., 897 F.2d 754, 759 (5th Cir. 1990) (noting that in situations where the insurer has refused to provide coverage and refused to participate in the defense of the insured, "the insured often can protect himself only with a covenant not to execute").

exceeds the limits of the primary policy.[12] Likewise, other jurisdictions have held that an insurer waives its right to rely on language in an insurance contract that limits the scope of an insured's coverage when the insurer breaches its duty to defend.[13]

---

[12] See, e.g., Metlife Capital Corp. v. Westchester Fire Ins. Co., 224 F. Supp. 2d 374, 388 (D.P.R. 2002) ("[I]n circumstances where the claim against the insured equals an amount exceeding the primary policy limits, the excess insurer's duty to defend may also be triggered."); Royal Ins. Co. of Am. v. Reliance Ins. Co., 140 F. Supp. 2d 609, 618 (D.S.C. 2001) (holding that a prayer for relief that clearly implicated excess policy limits triggered an excess carrier's duty to defend); Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am., 93 F. Supp. 2d 982, 993-94 (S.D. Ind. 2000) (concluding that an excess insurer owed a duty to its insured once the excess insurer understood that the primary policy would be exhausted); Am. Motorists Ins. Co. v. Trane Co., 544 F. Supp. 669, 692 (W.D. Wis. 1982), aff'd, 718 F.2d 842 (7th Cir. 1983) (stating that "if the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer's duty to defend is usually activated, even if the underlying insurer undertakes the defense as well"); cf. House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co., 775 F. Supp. 2d 302, 306-07 (D. Mass. 2011) (finding that a primary insurer breached its duty to defend because it was on notice that the potential scope of liability would fall within the applicable policy but nonetheless failed to defend the insured).

[13] See, e.g., Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co., 480 F.3d 1254, 1260-61 (11th Cir. 2007) (stating that an insurance contract's "'legally obligated to pay' language does not block an otherwise valid coverage obligation when an insurer refuses to defend the insured and the injured party enters into a reasonable and good faith settlement that precludes proceeding against the insured" (citing Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., 851 So.2d 466, 490 (Ala. 2002))); Jones v. S. Marine & Aviation Underwriters, Inc., 888 F.2d 358, 361 (5th Cir. 1989) (noting that an insurer may waive the right to rely on the "legally obligated to pay" language contained in the applicable insurance policy once the insurer breaches its defense obligation to an insured).

Judge Lipez's fine opinion alludes to both of these doctrines, but I wish to make my own views more explicit. Our holding today rightly emphasizes the importance placed on the plain language of insurance contracts and settlement agreements. However, we must not ignore the unique purpose of excess insurance coverage: "to protect the insured against the risk of costs exceeding the limits of primary coverage." Pac. Emp'rs Ins. Co. v. Travelers Cas. & Sur. Co., 136 F. Supp. 3d 211, 219 (D. Conn. 2015) (emphasis added). Because an excess carrier may otherwise shirk its responsibilities to its insureds if it is allowed to rely on the terms of a settlement agreement with impunity, courts should interpret the duty to defend broadly (at least when a plaintiff and underlying defendant reach a good-faith, collusion-free settlement that exhausts the primary carrier's coverage).[14] See Metlife Capital Corp., 224 F. Supp. 2d at 388 (stating that "[t]he duty to defend arises when the possibility

_____

[14] Of course, the dangers of possible collusion between the insured, the primary insurance carrier, and the plaintiff means that courts must always take steps to ensure that settlements are reached in good faith. See Campione, 661 N.E.2d at 663 (stating that Massachusetts courts "do not ignore the risk that, when a prejudgment settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor"). However, these concerns are mitigated in this case because AIC participated in the mediation sessions and presumably kept itself informed of the settlement discussions.

exists, from a liberal interpretation of the pleadings, that the insured is protected by the policy issued, regardless of the final outcome of the case").  Similarly, a rigorous application of the waiver rule encourages excess insurers to fulfill their responsibilities under the duty to defend, thereby decreasing the occurrence of costly litigation.  See Solo Cup Co. v. Fed. Ins. Co., 619 F.2d 1178, 1185 (7th Cir. 1980) (noting that "one of the basic purposes of" the duty to defend is the "protection of the insured from the expenses of litigation").

Unfortunately, Massachusetts case law currently offers few insights into these issues.[15]  Our analysis, to some extent, is also affected by Salvati not raising some arguments that may have led to a different outcome.  See ante, at 17 (noting, among other things, that Salvati "does not contend that AIC somehow

---

[15] Nonetheless, Massachusetts courts have found that in cases of ambiguous language in insurance contracts, the excess carrier may be required to "drop down" and cover an insured party after a policyholder enters into a settlement and the full scope of primary coverage is unavailable (e.g., if the primary insurer is insolvent).  See, e.g., Mass. Bay Transp. Auth. v. Allianz Ins. Co., 597 N.E.2d 439, 443 (Mass. 1992) (upholding validity of "drop down" coverage in excess insurance contracts but finding relevant insurance contract unambiguous); Gulezian v. Lincoln Ins. Co., 506 N.E.2d 123, 124 (Mass. 1987) (stating that an ambiguous insurance contract "should be read to drop down to provide indemnity coverage to the extent that [the primary insurer's] insolvent estate does not").  These cases hint at the willingness of Massachusetts courts to consider interpreting contractual language establishing an excess insurer's duty to defend in a broad manner, at least in some circumstances.

waived the right to rely on [the text of the indemnification provision], perhaps through its continued refusal to defend or indemnify the Underlying Defendants").  Even so, one would anticipate that when a Massachusetts court eventually does encounter another plaintiff in Salvati's position who raises these arguments, it will consider the practical effects of its decision on plaintiffs, insureds, and insurers throughout the Commonwealth.