# United States Court of Appeals
## For the First Circuit

Nos. 24-1855
     24-1856

BI 40 LLC,

Plaintiff, Appellee/Cross-Appellant,

v.

IRONSHORE SPECIALTY INSURANCE COMPANY,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Montecalvo, Lynch, and Kayatta,
Circuit Judges.

Ronald P. Schiller, with whom Michael R. Carlson, Isabel C. Naveira López, and Hangley Aronchick Segal Pudlin & Schiller were on brief, for appellant/cross-appellee.

Stephanie R. Parker, with whom David B. Mack and O'Connor Carnathan & Mack LLC were on brief, for appellee/cross-appellant.

August 25, 2025

MONTECALVO, <u>Circuit Judge</u>.  This insurance coverage dispute arises from an insurer's denial of coverage to an "Additional Insured" entity under a claims-made insurance policy (the "Policy").  The insurer, Ironshore Specialty Insurance Company ("Ironshore"), issued the Policy to Tewksbury Living Group, LLC d/b/a Wood Haven Senior Living ("TLG"), the Original Insured.  The Policy provided insurance coverage for TLG's operation of a 64-bed, elder care facility ("Wood Haven"), which specialized in care for individuals with Alzheimer's and other forms of dementia.  An endorsement to the Policy identified the plaintiff, BI 40 LLC ("BI 40"), as one of a handful of "Additional Insured" entities, who were covered for claims that fell within certain, narrow parameters.[1]  This appeal concerns Ironshore's denial of coverage to BI 40.

The legal claims giving rise to this dispute relate to events at Wood Haven that occurred in January 2022.  That month, several residents were abruptly removed from the facility for reasons that are hotly contested, but largely irrelevant to this appeal.  For our purposes, what matters is that the residents' removal prompted the filing of lawsuits alleging, among other

---

[1]  An endorsement is an amendment, addendum, or rider to an insurance policy, which "may expand, restrict, or clarify coverage and take precedence over the original, more general provisions because it is a later writing and is usually more specific in its terms."  Endorsement, Black's Law Dictionary (12th ed. 2024).

claims, wrongful eviction against the entities that financed and controlled Wood Haven. This coverage action stems from two such lawsuits and Ironshore's determination that it had no duty to defend BI 40 as to either. In response to Ironshore's denial of coverage, BI 40 filed this lawsuit seeking a declaration that Ironshore had a duty to defend as to both lawsuits, along with two related state-law claims.

Following discovery, Ironshore and BI 40 cross-moved for summary judgment. The district court allowed in part and denied in part the cross-motions, holding that Ironshore had a duty to defend one action but not the other. Both parties appealed. Because we conclude that Ironshore does not have a duty to defend either action, we reverse in part and affirm in part the district court's order.

## I.    Background

### A.    BI 40's Investment in Wood Haven

As noted above, TLG operated Wood Haven, an elder care facility in Tewksbury, Massachusetts. BI 40, for its part, is a commercial real estate loan provider that, in 2019, loaned $6.8 million to the company that owned the property on which Wood Haven operated, EC Tewksbury LLC ("EC Tewksbury"). In exchange for the loan, BI 40 received a mortgage interest in the property. TLG later became a co-borrower on the loan, and, in 2020, EC Tewksbury and TLG defaulted on their loan obligations.

Following a period of forbearance, BI 40 filed a complaint in the U.S. District Court for the District of Massachusetts and moved for KCP Advisory Group, LLC ("KCP"), to be appointed as receiver. In its complaint, BI 40 stated that its rationale for seeking appointment of a receiver was, in part, based on "conditions . . . deteriorat[ing]" at the facility, which "put[] the resident population at risk and jeopardiz[ed] the collateral securing [TLG and EC Tewksbury's] indebtedness to [BI 40]."  At the hearing on the receivership motion, counsel for BI 40 told the court that KCP would work to "[e]nsur[e] that the standard of care to the residents is maintained" and that BI 40 was "fully prepared to fund" the facility's ongoing operations.  On December 9, 2021, the district court granted BI 40's motion and appointed KCP as receiver.

## B.    The Underlying Lawsuits

The lawsuits giving rise to this coverage dispute involve largely overlapping allegations.  Relevant here, both complaints allege that Wood Haven was not properly maintained, which caused numerous problems including a burst water pipe in January 2022 that caused damage to residents' apartments.  Both further allege that residents were wrongfully evicted from the facility in January 2022, based in part on the misrepresentation that the Tewksbury Fire Department had issued a mandatory evacuation order for Wood Haven.  Finally, both complaints allege

- 4 -

that TLG charged new residents an unlawful one-time administrative fee upon the signing of their residency agreement.

### i. The **Frost** Action

Sue Frost, now deceased, was a Wood Haven resident who sued BI 40 and KCP in the U.S. District Court for the District of Massachusetts after she was removed from the facility.[2] Her complaint alleged that her removal was part of a "resident dumping scheme" carried out in violation of the law and without sufficient notice as required by her residency agreement. She asserted seventeen counts, including eleven against BI 40. As relevant here, the counts against BI 40 included breach of contract; violation of Massachusetts's Consumer Protection Act, Mass. Gen. Laws ch. 93A; breach of implied warranty of habitability; breach of the covenant of quiet enjoyment; and violation of state law limiting what fees a landlord may require a tenant to pay, Mass. Gen. Laws ch. 186, § 15B.

### ii. The **Salie** Action

Joanna MacAulay, the legal representative and power of attorney holder for resident George Salie, filed a putative class action in Massachusetts state court against TLG and other

---

[2]   In addition to BI 40 and KCP, Frost's complaint named Robert Eisenstein and EF, LLC, as defendants. She did not, however, assert claims against TLG.

defendants who owned, operated, or financed the facility.[3]  Neither the original complaint nor the first amended complaint named BI 40 as a defendant.  But in April 2023, the plaintiffs moved in state court for leave to file a second amended complaint and to add nine new defendants, including BI 40.  The proposed second amended complaint alleged that BI 40 assumed responsibility for the receiver's obligations under the residency agreements but failed to adequately fund Wood Haven's operations.  Although the state court granted the Salie plaintiffs leave to file their proposed second amended complaint, it denied their request to add BI 40 as a defendant.

### C.   The Insurance Policy

Relevant here, Ironshore issued TLG a primary insurance policy titled the "Long Term Care Organizations Professional Liability, General Liability, Employee Benefits Liability and Regulatory Proceeding Defense Coverage Policy" and assigned the policy number HC7SACFPT3001.[4]  The Policy contains multiple insuring agreements, but only Insuring Agreement "(B)" -- which provides for "Claims Made General Liability Insurance; Medical

---

[3] Although the case caption for the class action is MacAulay v. Tewksbury Living Grp., LLC d/b/a Wood Haven Senior Living, the district court referred to the case as the "Salie" action.  For consistency, we continue to refer to the state court class action as the "Salie" action in this opinion.

[4] Ironshore also issued TLG an excess insurance policy, but that policy is not implicated here.

Expense Payments" -- bears on the issues before us.[5]  Insuring Agreement (B)'s General Liability coverage includes any claim alleging "Bodily Injury, Property Damage, Advertising Injury or Personal Injury."  Under Insuring Agreement (H), Ironshore "has the right and duty to defend" any such claim covered by Insuring Agreement (B) "even if any of the allegations of such Claim are groundless, false or fraudulent."

Also key to this dispute is "Endorsement # 3" to the Policy, titled "Blanket Additional Insured - G[eneral] L[iability] Only."  As the title suggests, the endorsement provides coverage for "Additional Insured" entities, including BI 40, and limits that coverage in several ways.  For one, Additional Insureds may only seek coverage under Insuring Agreement (B) -- the general liability insurance agreement.  Second, coverage for Additional Insureds is restricted to "liability incurred solely as a result of the acts, errors or omissions of [TLG]."  Third, the endorsement provides that "[n]o coverage will be available under this Policy for any Claim based on or arising out of any actual or alleged independent or direct liability of any Additional Insured."

_____

[5]  Relevant here, a claims-made insurance policy "covers claims made against the insured during the policy period rather than claims arising from covered acts occurring during the policy period." Stormo v. State Nat'l Ins. Co., 116 F.4th 39, 46-47 (1st Cir. 2024), cert. denied, ___ U.S. ____, 145 S. Ct. 1430 (2025).

- 7 -

## II.  Procedural History

After Ironshore denied coverage, BI 40 filed this lawsuit in the U.S. District Court for the District of Massachusetts.  Its operative complaint sought a declaration that Ironshore had a duty to defend both the Frost and Salie actions and had to compensate BI 40 for the legal fees and costs it had incurred defending against the lawsuits.  It also asserted counts for breach of contract and violation of Mass. Gen. Laws ch. 176D and 93A, which impose liability for entities that engage in unfair or deceptive practices.  Ironshore counterclaimed seeking a declaration that it had no duty to defend or indemnify BI 40.  The parties subsequently cross-moved for summary judgment.

On June 21, 2024, the district court issued an order allowing in part and denying in part the parties' cross-motions. First, it held that Ironshore had a duty to defend BI 40 with respect to the Frost action because the count alleging improper collection of an administrative fee was based solely on the conduct of the Original Insured: TLG.  For that reason, the district court found that the Frost action fell within Endorsement # 3's limited coverage for Additional Insureds.

Second, the district court held that Ironshore had no duty to defend the Salie action.  On that point, the court began by observing that "the record indicates that BI 40 did not notify Ironshore of the underlying plaintiffs' motion . . . until after

- 8 -

BI 40 had submitted its opposition and attended the motion hearing." The court thus reasoned that because the Policy required that the Additional Insured provide such notice, BI 40's failure to timely do so alleviated Ironshore of its duty to defend.

Finally, the district court granted summary judgment to Ironshore as to BI 40's counts asserting that Ironshore violated Mass. Gen. Laws ch. 176D and 93A by engaging in unfair and deceptive acts, finding that there was insufficient evidence of bad faith. After the district court entered its final judgment, both parties timely filed notices of appeal.

### III. Discussion

We review de novo the district court's rulings on the parties' cross-motions for summary judgment. Zurich Am. Ins. Co. v. Elec. Me., LLC, 927 F.3d 33, 35 (1st Cir. 2019). Because the instant appeal demands only that we "interpret the relevant provisions of the Policy, [because there is] no genuine dispute of material facts, we must affirm the judgment below if the district court's conclusions were correct as a matter of law." Lionbridge Techs., LLC v. Valley Forge Ins. Co., 53 F.4th 711, 718 (1st Cir. 2022).

There are two questions before us: do the allegations in either the Frost action and/or the separate Salie lawsuit trigger coverage under Endorsement # 3 to the Policy? Before diving in, we take stock of the applicable law and the legal framework that

guides our analysis. Here, all agree that Massachusetts law controls with regard to Ironshore's duty to defend.[6] In Massachusetts, "[a]n insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms." Billings v. Com. Ins. Co., 936 N.E.2d 408, 414 (Mass. 2010). "There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage," Sterilite Corp. v. Cont'l Cas. Co., 458 N.E.2d 338, 341 (Mass. App. Ct. 1983) (quoting Union Mut. Fire Ins. Co. v. Inhabitants of Topsham, 441 A.2d 1012, 1015 (Me. 1982)), but if the "allegations in the underlying complaint lie expressly outside the policy coverage . . . the insurer is relieved of the duty to . . . defend the claimant." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 531 (Mass. 2003) (quoting Timpson v. Transamerica Ins. Co., 669 N.E.2d 1092, 1095 (Mass. App. Ct. 1996)).

To determine whether the allegations in a complaint trigger the duty to defend, we "compare the allegations in the

---

[6] In filing this lawsuit, BI 40 invoked the federal district court's diversity jurisdiction. And in ruling on the parties' cross-motions for summary judgment, the court therefore properly applied state substantive law to evaluate their arguments. We do the same on appeal. López-Santos v. Metro. Sec. Servs., 967 F.3d 7, 11 (1st Cir. 2020) ("As a federal court sitting in diversity jurisdiction, we must apply state substantive law to assess whether summary judgment is appropriate.").

underlying complaint against the provisions of the insurance policy." Lionbridge Techs., LLC, 53 F.4th at 719 (cleaned up) (quoting Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co., 991 N.E.2d 638, 641 (Mass. 2013)). "Any uncertainty as to whether the pleadings include or are reasonably susceptible to an interpretation that they include a claim covered by the policy terms is resolved in favor of the insured . . . ." Deutsche Bank Nat'l Ass'n, 991 N.E.2d at 642; accord Clarendon Nat'l Ins. Co. v. Phila. Indem. Ins. Co., 954 F.3d 397, 405 (1st Cir. 2020).

The party claiming coverage -- here, BI 40 -- "generally bears the burden of proving that a particular claim falls within a policy's coverage." Salvati v. Am. Ins. Co., 855 F.3d 40, 45 (1st Cir. 2017) (quoting Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007)). "Once the insured makes an initial showing that the overall coverage provisions of the insurance policy apply, the burden 'shifts to the insurer to demonstrate that some exclusion defeats coverage.'" Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co., 734 F.3d 51, 55 n.1 (1st Cir. 2013) (quoting Vt. Mut. Ins. Co. v. Zamsky, 732 F.3d 37, 41 (1st Cir. 2013)).

Finally, Massachusetts law applies an "in for one, in for all" approach, meaning that "[i]f even one of the counts in either of the complaints falls within the coverage provisions but outside any exclusion, [the insurer] would have a duty to defend

- 11 -

the entire lawsuit." Saint Consulting Grp., Inc. v. Endurance Am. Specialty Ins. Co., 699 F.3d 544, 550 (1st Cir. 2012).

## A. BI 40's Coverage as an Additional Insured

Pursuant to Endorsement # 3, the Policy affords BI 40 and other Additional Insureds general liability insurance only. Insuring Agreement (B), in turn, limits the Policy's general liability insurance to include "Bodily Injury, Property Damage, Advertising Injury or Personal Injury." The parties agree that Personal Injury is the only category potentially relevant here, which is further defined as an "injury, other than Bodily Injury, arising out of one or more Personal Injury Offense(s)," including "the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor."[7] Endorsement # 3 further provides that coverage for Additional Insureds is limited to liability "incurred solely as a result of the acts, errors or omissions of [TLG]." Lastly, it states that Additional Insureds are not covered as to "any Claim based on or arising out of any actual or alleged independent or

---

[7] To the extent that BI 40 disputes that Personal Injury is the only type of injury at issue, any such disagreement is waived as it failed to develop any argument on that point. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

direct liability of any Additional Insured."[8]  In other words, the "Additional Insured" endorsement clause is not triggered unless the claim is one for Personal Injury (here, in the form of "wrongful eviction"), which was incurred solely by TLG, and which did not arise out of independent or direct liability of any Additional Insured.

## B.    The Frost Action

Below, the district court held that Ironshore had a duty to defend BI 40 in the Frost action based on a single count in the operative complaint.  That count alleged violation of Mass. Gen. Laws ch. 186, § 15B, based on TLG's unlawful collection of an administrative fee from Frost when she first moved into Wood Haven.[9]  Because the district court (1) found that liability for that count was based solely on TLG's act and (2) construed the count as alleging Personal Injury -- specifically, wrongful eviction -- it held that the count triggered coverage for Additional Insureds.

_____

[8]   The other Additional Insureds include Meridian Senior Living, LLC, Sino Ocean Meridian Holdings LLC, and KCP.

[9]   Chapter 186 of the General Laws of Massachusetts provides, in relevant part, that lessors may not require a tenant "to pay any amount in excess of" rent for the first and last month of occupancy, a security deposit equal to the first month's rent, and the cost to purchase and install a key and lock.  Mass. Gen. Laws ch. 186, § 15B(1)(b).  Frost alleged that Wood Haven's collection of an administrative fee was unlawful as it was not a charge enumerated by the statute.

On appeal, Ironshore challenges both conclusions while BI 40 defends the district court's decision and, in the alternative, argues that even if the count premised on collection of the administrative fee does not trigger coverage, certain other counts and allegations do.

We start with the count alleging unlawful collection of an administrative fee. In it, Frost alleges that TLG unlawfully required her to pay a $3,500 administrative fee when she signed her residency agreement in May 2021, that such a fee was in excess of the fees allowed by Mass. Gen. Laws ch. 186, § 15B, and that the fee was assessed with the "inten[t] to reimburse the [Wood Haven] Community for services rendered in initiating Resident's Occupancy and person care assessment as well as for the continued maintenance of the community areas and common grounds." Frost's complaint further alleges that "either BI 40 or [KCP] hold, possess, or maintain Frost's Administrative Fees."

To conclude that the administrative fee count triggered coverage, the district court needed to, and did, find that the count (1) arose solely based on TLG's actions and (2) alleged a Personal Injury. At first blush, TLG's collection of the administrative fee does not appear to allege a Personal Injury -- for example, wrongful eviction -- that would fall within the Policy's definition. Yet the district court held that it did just that, reasoning that because the complaint alleged that the

- 14 -

fee was collected, in part, to cover the cost of "continued maintenance," and because Frost's removal from Wood Haven was tied to maintenance issues, that link was sufficient to construe the count as alleging wrongful eviction.

We disagree with that analysis for two reasons. First, as a threshold matter, we disagree that the administrative fee count can be reasonably construed as alleging wrongful eviction. Under Massachusetts law, the insurer's duty to defend is determined by "the source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint." New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co., 667 N.E.2d 295, 299 (Mass. App. Ct. 1996). Applying that principle to Frost's allegations underlying the administrative fee count, the source of Frost's injury with respect to that alleged unlawful act was the payment of the fee and the associated pecuniary loss. Thus, while ambiguities must be construed in favor of the insured, we find that the source of Frost's alleged injury with respect to the administrative fee was unambiguous and not reasonably construed as alleging wrongful eviction.[10] See Narragansett Jewelry Co. v. St. Paul Fire & Marine Ins. Co., 555 F.3d 38, 41-42 (1st Cir. 2009).

---

[10] Because we conclude, for the above stated reasons, that Ironshore had no duty to defend the Frost action based on the administrative fee count, we need not address Ironshore's argument that Gowen v. Benchmark Senior Living, LLC, No. 1684CV03972BLS2,

- 15 -

Second, even if the administrative fee count could be construed as alleging wrongful eviction, liability for that wrongful eviction would not be based solely on TLG's acts. As the complaint details, and due to BI 40's motion seeking appointment of a receiver, control of Wood Haven transitioned from TLG to KCP in December 2021 -- prior to Frost's alleged wrongful eviction. And Frost's complaint alleges that, in connection with KCP's appointment, "BI 40 [had] assumed responsibility for [KCP's] compliance with Frost's residency agreement" including "perform[ing] necessary maintenance and repairs." In other words, Frost's complaint alleges that BI 40 was partially liable for Frost's eviction (because it failed to ensure KCP complied with residents' residency agreements, including by failing to perform necessary maintenance and repairs). Thus, to the extent that the administrative fee count can be construed as alleging wrongful eviction, doing so takes it outside the scope of coverage for Additional Insureds.

We next consider the alternative counts that BI 40 argues trigger coverage for Additional Insureds. They include Frost's counts for breach of contract, breach of the warranty of habitability, and the violation of the covenant of quiet enjoyment.

2017 WL 3251585, at *3 (Mass. Super. Ct. May 8, 2017), supports its argument that BI 40 can be held directly liable for violation of Mass. Gen. Laws ch. 186, § 15B merely by retaining the fee unlawfully collected by TLG.

- 16 -

Each, however, suffers from the same fatal flaw in that each is premised on the claim of wrongful eviction but, as discussed above, liability for that injury is not alleged as solely attributable to TLG. Recall that Frost's complaint alleges that she was evicted from the facility in January 2022, after the district court appointed KCP as receiver (at BI 40's request), and that BI 40 had "assumed responsibility for [KCP]'s compliance with Frost's residency agreement" including "perform[ing] necessary maintenance and repairs." Because those allegations lay the blame for Frost's eviction, in part, at the feet of BI 40 and KCP, claims based on that injury lay outside the scope of coverage for Additional Insureds.

In an effort to evade this conclusion, and despite the Frost complaint's express assertion that BI 40 was partially liable for Frost's eviction, BI 40 raises three arguments that allegations regarding post-receivership wrongdoing should be attributed solely to TLG and not to BI 40 or KCP. First, BI 40 contends that it is "factually incorrect to say that the wrongdoing exclusively occurred after appointment of the Receiver." While that may well be true, Endorsement # 3 requires that liability be "incurred solely as a result of the acts, errors or omissions of [TLG]." Accordingly, whether the wrongdoing exclusively occurred after KCP was appointed as the receiver is beside the point. What is material is that the complaint alleges that some of the

- 17 -

wrongdoing was done by a party other than TLG. As Frost's complaint specifically alleges that BI 40 and KCP engaged in wrongdoing that resulted in her wrongful eviction, that is sufficient to exclude coverage under Endorsement # 3.

Second, BI 40 notes that "nothing in the Policy . . . states that Ironshore can avoid coverage where a receiver takes over and stands in the shoes of the Insured," and that "the Policy provides that the Insurer is not relieved of its obligations in the analogous situations of bankruptcy or insolvency." Again, that may be the case, but Ironshore does not contend that the appointment of KCP as the receiver relieved Ironshore of any insuring obligations. Rather, its argument, with which we agree, is that the complaint alleges that the receiver caused in part the wrongful eviction such that the eviction was not solely attributable to TLG and thus outside the scope of coverage for Additional Insureds.

Third, BI 40 highlights that the Receivership Order "prohibits [TLG] from being removed from the policies upon commencement of the Receivership" and contends that "cuts against any notion that coverage can be denied for an otherwise covered claim simply because [TLG] is in receivership." But that argument misreads the Receivership Order, which only requires that TLG maintain its insurance policies until, as directed by the order, control of the facility transitions to a new party. That

requirement does not speak to whether liability was incurred in such a way that it is outside the scope of coverage for Additional Insureds.

As a final alternative, BI 40 argues that we must evaluate Frost's complaint as a whole and that, when so viewed, it alleges a wrongful act solely attributable to TLG (charging the administrative fee) and a Personal Injury (wrongful eviction). As BI 40 sees it, "the operative question is whether there was at least one claim in the complaint that was based solely on [TLG's] conduct, not whether the eviction was solely carried out by [TLG]." The Policy, however, provides no support for BI 40's proposed mix-and-match approach, pursuant to which two claims that fall outside the Policy's coverage could be combined to establish coverage.

Finding that Frost's complaint alleges no counts that trigger coverage for BI 40, we reverse the district court's partial grant of summary judgment to BI 40 as to the Frost action and remand for further proceedings consistent with this opinion.

### C.  The Salie Action

The district court also held that Ironshore had no duty to defend BI 40 as to the Salie action and, consequently, was not required to reimburse BI 40 for costs incurred in opposing the Salie plaintiffs' attempt to add BI 40 as a defendant. The court did so on the basis that (1) it was not aware of any caselaw

holding that an insurer has a duty to defend such a motion and (2) even if such a motion was covered, the Policy provided that "[n]o Insured shall, except at its own cost, incur any expense, make any payment, . . . or incur any Defense Expenses . . . without the Insurer's written consent," and BI 40 was attempting to recover for costs it incurred before providing notice to Ironshore.

On appeal, BI 40 advances two primary arguments to challenge the district court's decision. First, BI 40 argues that the plain language of the Policy "makes clear" that coverage extends to costs incurred in opposing a motion seeking to add an insured as a defendant, as such a motion falls within the Policy's definition of a "Claim." Second, it argues that there was no obligation to notify Ironshore regarding the Salie plaintiffs' motion for leave to amend because in May 2022, approximately ten months prior to said motion, Ironshore sent BI 40 a denial of coverage letter regarding both the Frost and Salie actions. In BI 40's view, the fact that Ironshore's letter "perform[ed] a coverage analysis for some of the claims in the Salie Action," effectively nullified BI 40's need to provide notice.

Even accepting BI 40's first point, its failure to comply with the Policy's requirement that BI 40 seek and receive approval prior to incurring defense related costs is dispositive under the Policy's terms and Massachusetts law. Starting with the

- 20 -

former, Section I(I)(1) of the Policy states that "except at its own cost" the Insured may not "incur any expense . . . without the Insurer's written consent." Yet, as the district court observed, "the record indicates that BI 40 did not notify Ironshore of the underlying plaintiffs' motion to add BI 40 as a defendant until after BI 40 had submitted its opposition and attended the motion hearing." On appeal, BI 40 does not point us to any document indicating to the contrary or, alternatively, any Policy provision that would render Section I(I)(1) inapplicable or unenforceable. As such, we see no basis to conclude that the district court erred in finding dispositive BI 40's failure to comply with Section I(I)(1).

As for Massachusetts law, our recent decision in President & Fellows of Harvard College v. Zurich American Insurance Co., 77 F.4th 33 (1st Cir. 2023), is instructive albeit not controlling. There, the insured (Harvard) conceded that it had not provided notice to the insurer, but argued such lack of notice should not justify denial of coverage if the insurer had actual notice of the claim. Id. at 38-39. In addressing this argument, we first noted that in Chas. T. Main, Inc. v. Fireman's Fund Ins. Co., 551 N.E.2d 28, 30 (Mass. 1990), the Massachusetts Supreme Judicial Court had established a general rule for claims-made insurance policies that the insurer "is not required to show prejudice before denying coverage due to an insured's failure to

comply with the [policy's] notice requirement." Harvard College, 77 F.4th at 38. Applying that rule, we rejected Harvard's argument based on the insurer's potential actual notice and explained that such an argument was "simply another way of arguing that [the insurer] was not prejudiced by the lack of timely written notice." Id. at 39.

In our view, BI 40's argument that notice was unnecessary given Ironshore's letter evidencing its actual notice of the Salie action is meaningfully similar to the argument we rejected in Harvard College. Both arguments turn on a lack of prejudice and alleged superfluousness of providing notice, notwithstanding applicable policy provisions. Moreover, as "[n]o subsequent Massachusetts decisions have called our reading [of Massachusetts law] into question," Stormo, 116 F.4th at 49, we find this reasoning dispositive. We therefore affirm the district court's holding that Ironshore had no duty to defend the Salie action.

### D. The Chapter 93A and 176D Counts

All that remains to consider is BI 40's contention that the district court erred in allowing Ironshore's motion for summary judgment as to BI 40's Chapter 93A and 176D claims alleging that Ironshore engaged in unfair and deceptive practices. In particular, BI 40 alleged that Ironshore was liable because it "[m]isrepresent[ed] pertinent facts or insurance policy provisions . . . ;" "[f]ail[ed] to acknowledge and act reasonably

- 22 -

promptly upon communications . . . ;" "[f]ail[ed] to adopt and implement reasonable standards for the prompt investigation of claims . . .;" "[r]efus[ed] to pay claims without conducting a reasonable investigation . . .;" "[c]ompell[ed] BI 40 to institute litigation to recover amounts due under the Policy;" and "[f]ailed to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim."

Under Massachusetts law, however, if an insurer's denial of coverage is reasonable, there can be no violation of Chapters 93A or 176D. Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 916 (Mass. 1993). Said differently, a good faith denial of coverage, based on a plausible interpretation of a policy, likely cannot give rise to claims under these state statutes. Gulezian v. Lincoln Ins. Co., 506 N.E.2d 123, 127 (Mass. 1987). Because we conclude that Ironshore's denial of coverage was consistent with the Policy, BI 40's Chapter 93A and 176D claims necessarily fail.

## IV. Conclusion

For the foregoing reasons, we **REVERSE** the district court's grant of BI 40's motion for summary judgment as to the Frost action and **AFFIRM** its grant of summary judgment to Ironshore with respect to the Salie action and BI 40's Chapter 93A and 176D claims. The case is remanded to the district court for further

proceedings consistent with this opinion.  The parties are to bear their own costs.